UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No.  04-10301-MLW |
| v. | ) | |
| | ) | |
| ANTONIO NAKIA REDRICK, | ) | |
| Defendant. | ) | |
| | ) | |

## GOVERNMENT'S RESPONSE IN OPPOSITION
## TO DEFENDANT'S MOTION TO DISMISS

The United States of America, by and through its attorneys, United States Attorney

Michael J. Sullivan and Assistant United States Attorney Paul R. Moore, respectfully submits

this Response in opposition to the defendant's Motion to Dismiss, filed with this Court on July

22, 2005.

## SUMMARY OF ARGUMENT

The defendant argues in his Motion to Dismiss that the government engaged in "coercive

interviews" and "gross" and "unreasonable" conduct in its contact with a potential witness for

the defendant.  Defendant argues that the conduct of the government agents resulted in obtaining

additional evidence which discredited his defense (that his ex-girlfriend had planted the shotgun

in the duffel bag he was carrying), that said evidence tended to "lethally" impeach him and that

impeachment evidence was developed against the potential defense witness as well - thus,

effectively, denying the defendant of a substantial right (compulsory process).

In fact, the evidence reveals that the defendant's right to compulsory process has not

been impermissibly abridged through the actions of government agents and that the defendant

has not exercised diligence in obtaining the appearance of the potential defense witness such that his anticipated non-appearance can be blamed on the government (*it is worth noting at the outset that the non-appearance is merely <u>anticipated</u> at this juncture*).  Further, the agents who interviewed the potential defense witness did not engage in unacceptable conduct in their interviews with him.  In short, no prosecutorial misconduct occurred.  Therefore, the Motion to Dismiss should be denied.

<u>BACKGROUND LEADING UP TO THE FIRST ATF INTERVIEW WITH RAY</u>

The government had no interaction with the prospective defense witness, Ray, nor did it have any interest in Ray until the defendant demanded that the government investigate the assertions contained within the affidavit the government received from defense counsel on January 21, 2005.[1]  That affidavit indicated that the affiant (Ray) had once been told by a former girlfriend (Tiffany Richardson) of the defendant (Redrick) that she had been angry at the defendant and knew of a way to get back at him (by placing a gun in his duffel bag, without his knowledge).

In the cover letter accompanying the affidavit and in conversations between the undersigned and defense counsel, defense counsel advised the government that it had a duty to fully investigate the matter to determine whether the assertions contained within the affidavit might lead to exculpatory evidence.[2]

On January 31, 2005, the undersigned replied in writing to defense counsel's demand for

---

[1]See Attachment 1 (Affidavit of Eddie Ray, Jr., provided to the government by defense counsel, via first class mail, on January 21, 2005).

[2]See Attachment 2, (Cover Letter from defense counsel Melvin Norris, dated January 19, 2005, and in which attorney Norris admonished the government to investigate the statements of Ray:  "I feel that your office should investigate these allegations....Your prompt response in (sic) requested.")

government action in response to the provision of the affidavit.  In so doing, the undersigned reiterated in writing what had been stated to counsel verbally: the government would attempt to locate and interview Ray and Ms. Richardson in its attempt to determine the veracity of the affiant's (Ray's) assertions.[3]

In that written reply, the government indicated to defense counsel that its agents had conducted initial inquiries and determined that Ray and the defendant had recently been incarcerated in the same facility (Concord MCI) and that Ray was being held in the South Bay Jail.

Between that communication and the June 3, 2005, interview conducted by government agents, South Bay records indicated that defense counsel had neither visited nor called Ray.

On June 3, 2005, two special agents with the Bureau of Alcohol, Tobacco and Firearms (lead Special Agent Richard Donahue and Special Agent Phillip Ball) arrived at the South Bay facility for the purpose of interviewing Ray, in accord with the government representation to defense counsel that it would do so.  A South Bay correctional officer brought Ray (who was not in handcuffs, leg irons or any other form of restraint) to a conference room where the two agents were waiting.[4]  Prior to speaking with the agents, Ray signed a form (provided by the facility) which indicated that he was present in the conference room freely and voluntarily and was not being forced by the facility to meet with the agents.[5]  The correctional officer then left the room, where the agents and Ray sat around a conference table and began talking.

---

[3] See Attachment 3 (Government's written response to defense counsel, dated January 31, 2005).

[4] Ray is not a slight figure.  According to recent police records, he stands at 6'2" tall and weighs 245 pounds.

[5] See Attachment 4 ("Interview Waiver" signed by inmate Eddie Ray, Jr.)

THE JUNE 3, 2005, INTERVIEW WITH RAY[6]

Special Agent Donahue (hereinafter "Donahue") began the interview by telling Ray that he was there to talk to him about the Antonio Redrick case and asked Ray if he was familiar with it. Ray, nodding, replied that he knew about the case. Donahue then told Ray that Redrick had already plead guilty in the case, but that ATF had a concern about the affidavit Ray had written and wanted to ask him some questions about it. Donahue laid a copy of the affidavit[7] on the table and Ray looked at it and indicated verbally that he recognized the document. Speaking in a friendly manner, Donahue said to Ray: "Look, Eddie. This thing is bullshit. You know it is. This doesn't have to be a big deal. If you were lying about this, I'm not going to make a big deal out of it. You just need to get in front of it right now and tell the truth. If you were lying, then theoretically you broke the law. I'm a gun cop. I don't really care about this kind of thing that much. So let's put this behind you."

Without any hesitation, Ray agreed with Donahue's assessment of the affidavit and so indicated by nodding his head in the affirmative and saying, "yeah, yeah, yeah. No problem. I made that up. I was doing a favor for that guy (Redrick). I felt bad for him and I was mad at the system. And he (Redrick) wrote it and I signed it." Donahue then asked him, "how'd this go down, Eddie?" Ray replied: "I overhead him (Redrick) talking in Concord (at MCI). I heard him talking about his case and it sounded familiar to me. I had met his girlfriend (Tiffany Richardson) once. She told me about the case. So, I told him (Redrick) that I remembered

---

[6]The following statements within quotation marks represent the recollections of the interview by the agents and the same statements are anticipated at the evidentiary hearing in this matter.

[7]See Attachment 1.

hearing about his case.  I came up to him, told him that sucks.  Redrick asked me to help him out.  I told him I would.  So he (Redrick) wrote it.  I signed it."

Donahue then told him, "if that's the case, I'm gonna have to have it in writing," to which Ray told him "yeah, man.  I knew as soon as I signed it, it was a mistake.  I shouldn't have done it."  Donahue told him, "okay, I'm gonna have to have you write down that the affidavit was false," to which Ray replied, "no, I'm no good at that.  You do it."

Donahue then wrote one sentence at a time and, as he was writing each sentence, read it aloud to Ray and asked Ray if he agreed with the meaning contained therein.  After Ray affirmed the truth of the statement contained within each sentence, Donahue wrote and then read the next sentence and similarly asked Ray if it was accurate and truthful.  At the completion of the short statement, Donahue told Ray, "hey Eddie, if that other (the first affidavit) was true, that's fine.  You have nothing to be worried about.  Ray replied, "no, no, no."  Donahue then said, "alright, if this one (the newly-drafted Affidavit) is true, then sign it.  Don't sign it if it isn't true."  Ray then signed his name to the June 3, 2005, affidavit.[8]

Donahue then told Ray: "hopefully, you'll never see me again.  I don't think this will be a big deal at all.  I appreciate you coming clean.  You get out soon, right?  What do you have planned?"  Ray replied that "I'm trying to get these grants from the government for counseling kids before they get in trouble.  I want to show them what to do.  Teach them right from wrong.  I been there."  Donahue then told Ray: "Eddie, I've seen your record.  If the government gives you money, I'm moving to Canada.  But good luck to you."  The two agents then shook hands with Ray and called the corrections officer to come to escort Ray from the conference room.

---

[8]See Attachment 5 (the June 3, 2005 Affidavit signed by Eddie Ray, Jr., before two special agents).

The entire interview took approximately ten minutes.

Later that day, Donahue placed a call to the undersigned and related the results of the interview.

The undersigned then placed a call to defense counsel within minutes of hearing the results of the interview. By June 11, 2005, defense counsel had paid a visit to South Bay and met with Ray. On June 11, 2005, the defendant filed his first Motion to Dismiss,[9] alleging "Prosecutorial Misconduct" by the government as a result of the June 3, 2005, interview by Donahue. Defense counsel referred in his Motion to the provision of the (original) affidavit as having been made merely as part of defendant's discovery obligations.

That assertion by the defendant represented a significant shift from his prior position demanding that the government investigate the matter of Ray's statement, as made clear in counsel's January 19, 2005, letter to the undersigned.[10]

## THE JULY 7, 2005, INTERVIEW WITH RAY[11]

Special Agent Donahue was aware that Ray was about to be released from South Bay and that defense counsel had indicated in his original Motion (June 11, 2005) that Ray had told defense counsel, upon hearing that the defendant had *not* plead guilty, that his original statement had been true (in the first affidavit provided by defense counsel in his letter dated January 19, 2005).

---

[9]See Attachment 6 (Defendant's original "Motion to Dismiss," dated June 11, 2005).

[10]See Attachment 2 (Cover letter from defense counsel Melvin Norris, dated January 19, 2005, and in which attorney Norris admonished the government to investigate the statements of Ray: "I feel that your office should investigate these allegations....Your prompt response in (sic) requested").

[11]The following statements within quotation marks represent the recollections of the interview by the agents and the same statements are anticipated at the evidentiary hearing in this matter.

Accompanied by Special Agent Mark DeSantis, Donahue returned to South Bay for the purpose of interviewing Ray to determine which assertion was true (that made to Agent Ball and him on June 3, 2005, or the subsequent statement to defense counsel, in which Ray recanted his statement to Donahue upon learning that the defendant had not plead guilty). The same procedures were followed and the same conference room was used for the interview. Again, Ray was not restrained and was brought to the conference room by a correctional officer.

Donahue began by saying, "Eddie, remember me? From that Antonio Redrick thing?" Ray replied, tersely, "yeah." Donahue said, "we have a problem. You signed an affidavit for me last month. And that said one thing. And now you told Redrick's attorney that you were lying to me."

At that point, Ray became visibly angry and yelled at Donahue, saying: "you lied to me. You told me he plead guilty and that was a lie. You fucking lied to me." Ray was then jabbing his finger at Donahue to emphasize the point. Donahue told Ray: "Eddie, it doesn't matter that I lied to you. What matters is did you lie on the affidavit you signed for me? This could be an issue for you. If it turns out you lied to me, you could go to jail for that."

Ray became more agitated, saying, "You fucking lied to me, you mother fucker. And now I'm supposed to talk to you. And now you're threatening me? Gonna put me in jail?" By this point, Ray was screaming and beginning to stand up.

Agent DeSantis (hereinafter "DeSantis") then intervened[12] in the conversation by saying: "Eddie, calm down. He's (Donahue's) not threatening you. If you lied on that affidavit, you could be charged with perjury. He's (Donahue's) telling you the truth. Let's not make a bigger

---

[12] By interjecting himself into the matter, DeSantis was following ATF training which provides for a more mild-mannered, independent-appearing insertion of one agent when the other agent is clearly viewed with hostility.

deal out of this than it has to be.  I don't have a problem with you.  I don't know much about this.  Listen, we're just trying to figure out if you were lying on the first affidavit or lying on the second affidavit.  We need to know the truth."  Ray replied by saying: "I wasn't lying.  I didn't fucking lie."  DeSantis asked him, "which one?"  Ray, screaming, said "I never lied.  I didn't lie.  Fuck you.  They're true.  I never told no lie!"

Donahue then asked: "Did you tell Redrick's attorney that what you wrote for me was a lie?"  Ray replied: "I didn't tell him shit.  I told him that I wanted to talk to my lawyer."  Ray then stood up and walked towards the door and shouted "fuck you.  Fuck you.  I'm leaving."  Alarmed at the intensity of Ray's apparent rage, both agents stood up and followed him and told him to sit down and wait for the corrections officer to come to escort him.  Donahue then immediately called the corrections officer, who came and told Ray to calm down.  DeSantis then said, "fine, Eddie.  They're going to take you away now.  That's fine.  We're done."

Donahue interjected: "Eddie, just listen to me for one more minute.  This case is going to be a trial.  You would probably get called to testify for Redrick.  At that point, you have no choice.  You have to tell the truth.  If you lie then, you could go to jail."  Ray replied: "there ain't no fucking way I'm testifying for anybody.  I don't care who the fuck they are."  Donahue said, "you won't have a choice, Eddie.  It's the law.  They can make you testify."  Ray replied (screaming): "I don't give a fuck about the law.  I have no respect for the law.  I don't care what they do."

DeSantis interrupted by saying, "this is ridiculous.  We're done here."  Donahue then told Ray: "Eddie, this is nothing personal.  I have no beef for you.  I'm doing my job."[13]  Ray replied

---

[13]Special Agent Donahue reported that this interview was one of the most potentially violent, confrontational interviews he had seen or experienced in his tenure at ATF.

by saying "okay."  The two then shook hands and the second interview had concluded within

minutes of when it began.

<center>STATEMENT OF THE LAW[14]</center>

The misrepresentation[15] by Donahue to potential defense witness Ray during the June 3,

2005, interview does not constitute governmental misconduct in the current matter.  Nor does the

statement to Ray that lying under oath can lead to a charge of perjury.  Neither assertion by the

government agent(s) constitutes impermissible governmental misconduct.  The defendant's right

to compulsory process, guaranteed by the Sixth Amendment, was not violated or abridged.  In

fact, it remains an assumed "harm" that Ray will not appear as a witness for the defendant.

Assuming, arguendo, that either or both assertions by the government agent(s) did

constitute impermissible misconduct in violation of one of the defendant's rights, then the

misconduct fails to rise to the level warranting dismissal of the Indictment.

I.    The defendant's right to compulsory process is not violated by government agents
      warning a potential defense witness that falsified testimony can lead to a perjury
      charge.

In United States v. Whittington, 783 F.2d 1210, 1218-19 (5th Cir. 1986), the court held

that the defendant's right to compulsory process was not violated when the prosecutor told a

known defense witness that the government believed that the witness had already given false

statements and that those statements, repeated under oath at trial, would support an indictment

for perjury.  In United States v. Davis, 974 F.2d 182, 188-89 (D.C. Cir. 1992), the court held that

---

[14]There is a shortage of available case law on the right to compulsory process and government interactions with witnesses.  Where necessary, this Response analogizes to Fifth Amendment law which more frequently than not relates to governmental interactions with defendants (as opposed to witnesses or potential witnesses).

[15]The misrepresentation being that the defendant, Redrick, had already plead guilty in this matter.

<center>– 9 –</center>

the defendant's right to compulsory process was not violated when the prosecutor warned the defendant of the potential for prosecution for perjury in the event that the defendant provided false testimony.  In <u>Harrington v. Nix</u>, 983 F.2d 872, 875 (8th Cir. 1993), the court found that the defendant's right to compulsory process was not violated when the prosecutor had allegedly intimidated a known defense witness through the administration of a polygraph and statements to the witness that she had failed the polygraph and warnings to her about the possibility of perjury charges being brought against her for her failure to be truthful in her testimony.  The court specifically found that the witness was not sufficiently intimidated such that she did not feel able to offer testimony.

II.    <u>Making false statements by government agents to a potential defense witness is a permissible form of investigation and does not constitute unacceptable coercion.</u>

In <u>United States v. Byram</u>, 145 F.3d 405, 408 (1st Cir. 1998), the court held that the use of false statements during police questioning is an acceptable interrogation method and that statements resulting from such a method are to be considered voluntary or non-coerced, absent other acts which are "so shocking to the conscience."   In <u>Byram</u>, the defendant had once testified on a related case and was, more or less, assured that his testimony would not be used to incriminate him.  In fact, his testimony served as the basis for his own indictment.  <u>Id</u>. at 408.

The First Circuit noted that "trickery is not automatically coercion" and that "indeed, the police commonly engage in such ruses as suggesting to a suspect that a confederate has just confessed or that police have or will secure physical evidence against the suspect.  While the line between ruse and coercion is sometimes blurred, confessions procured by deceits have been held voluntary in a number of situations." <u>Id</u>. at 408.  The First Circuit continued: "Further, the

Supreme Court's tolerance of police guile in <u>Frazier</u>[16] makes clear that the police can often mislead suspects, at least where coercion is not involved; thus, it is impossible to treat all such false statements as improper, let alone outrageous or uncivilized.  Police investigation can be a rough business, and untruths may sometimes be necessary to save a kidnap victim, retrieve a missing firearm, or for other reasons quite apart from the desire to solve a specific crime already committed." <u>Id</u>. at 409.

> III.     <u>The defendant bears the burden of proving the causal nexus between the nonappearance of the witness and the alleged government misconduct</u>.

According to <u>United States v. Hoffman</u>, 832 F.2d 1299 (1st Cir. 1987), in order to prove that the defendant's right to compulsory process was effectively denied by the acts of government agents, the defendant bears the burden of demonstrating that there is material and favorable testimony which is missing as a result of the non-appearance of a defense witness. More specifically, the First Circuit in <u>Hoffman</u> said that the defendant must offer, "at a minimum...some plausible nexus between the challenged governmental conduct and the absence of certain testimony." <u>Id</u>. at 1303.  There, the First Circuit paid particular attention to the causal element and whether the inability to obtain the witness' testimony was caused solely by the prosecutor's "intemperate call" to the attorney for the defense witness or whether other factors may also have contributed to the non-appearance of the witness.  <u>Id</u>. at 1304.


> IV.     <u>The defendant must demonstrate his own diligence in attempting to obtain the appearance of the witness</u>.

In affirming the denial of the defendant's motion, the First Circuit in <u>Hoffman</u> examined

---

[16]In <u>Frazier v. Cupp</u>, 394 U.S. 731, 89 S.Ct. 1420, 1425, the Supreme Court held that the use of false statements by police to the defendant did not render the resulting confession of the defendant inadmissible.

the breadth of effort which had been made by the defendant in cultivating the testimony and

presence of the defense witness and found it to be lacking, to say the least ("appellant's desire to

use Thais as a witness burned with a flickering flame at best, and his efforts to produce her as a

trial witness were considerably less than diligent"). Id. at 1304-05.  The court continued in this

examination as a reason for the district court's denial of the motion: "Indeed, she had never been

asked to testify at Hoffman's trial and had not agreed to do so.  To attribute her nonappearance,

then, to the AUSA's shot from the hip–or, more precisely put, the AUSA's shot from the

lip–requires a leap of faith unsupported by reason or logic." Id. at 1305.  The First Circuit went

on to state that the full range of other factors that may have entered into the reasoning of the

defense witness in not appearing should be considered, rather than merely viewing the

government act in a vacuum as the sole potential cause for the non-appearance of the witness (Id.

at 1305).

V.    Dismissal is not the proper remedy where a court believes that impermissible
      misconduct has occurred, except in the most extreme circumstances.

In United States v. DiGregorio, 605 F.2d 1184, 1189 (1st Cir. 1979), the court held that

mere intimidation of a witness is not sufficient to warrant dismissal of a case, even if the

government's conduct is found to be "reprehensible."  In DiGregorio, the prosecutor was found

to have intimidated a witness before the grand jury by intimating that the targets of the

investigation were likely to harm the witness.  Id. at 1189.  There, the court agreed with the

district court that the prosecutor had overstepped ethical boundaries and came close to tainting

the indictment through the intimidation of the witness before the grand jury.  Having so found,

the court rejected dismissal as the proper outcome.

In United States v. Giorgi, 840 F.2d 1022, 1030 (1st Cir. 1988), the court found that dismissal of an indictment is reserved for cases of "serious and blatant" government misconduct and held that a prosecutor's good faith attempt at impeachment of a defense witness did not constitute such government misconduct.

In United States v. Rodriguez, 738 F.2d 13 (1st Cir. 1984), the court emphasized that the "remedy of dismissal of an indictment based on prosecutorial or government misconduct is an extraordinary one and is generally applied to insure proper conduct by the government and its agents."

<u>ARGUMENT</u>

This defendant "stumbles at the starting gate," as did the appellant in United States v. Ortiz de Jesus, 230 F.3d 1 (1st Cir. 2000), by not proving that misconduct occurred at the hands of the government agents during the June 3, 2005, interview with inmate Ray.

I.    The conduct of the government agents vis-a-vis Ray did not constitute prosecutorial misconduct.

As stated, the courts have consistently held that mere false statements to a witness, even a defendant, do not alone constitute prosecutorial misconduct. See United States v. Byram, 145 F.3d 405 (1st Cir. 1998) and Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420. In this case, what is arguably a less consequential misrepresentation by governmental agents occurred than found at issue in those cases. Without question, the courts have upheld the right of government agents to make false statements in the process of interviewing, even interrogating, defendants and their potential witnesses. As such, the "lie" to Ray that defendant Redrick had pled guilty is an insufficient basis for the assertion that unacceptable prosecutorial misconduct occurred.

-13-

Nor do warnings to a potential witness that he may be charged with perjury if he falsifies his testimony constitute an impermissible investigative technique.  In Harrington v. Nix, 983 F.2d 872, 875 (8th Cir. 1993), the court found that a series of more intense interactions and confrontations between the government agents and a known defense witness did not result in an abridgement of the defendant's right to compulsory process when the witness refused to testify.

In the current matter, the agents merely interviewed a potential defense witness and in so doing the agents advised him *after* his admission regarding the original affidavit's falsity that he could be charged for perjury if he was lying.

The propriety of warning a potential defense witness - even a defendant - that prosecution for perjury may result from falsification of testimony is well-established.  It does not provide a legitimate basis for any relief in the instant matter.

II.    The defendant has not met his burdens under *Hoffman*.

In its Hoffman decision, the First Circuit made abundantly clear that it is the burden of the defendant to prove the causal nexus between the non-appearance of a witness and the alleged government misconduct.  Again, it is worth noting, the non-appearance of Ray has yet to occur.

Although the government does not concede misconduct here, assuming arguendo that the agent's false statement to Ray that Redrick had pled guilty, and his issuance of the perjury warning did constitute misconduct, the defendant's Motion still fails.  In Hoffman, the court considered various possibilities for the witness's non-appearance and, in so doing, made clear that the government actions cannot and should not be considered in a vacuum.  Other reasons for the non-appearance are to be explored by the defendant in meeting his burden.  See Hoffman, 832 F.2d at 1303-1304.  And yet the defendant, in his Motion, ignores the extensive criminal

-14-

record of Ray[17] and the likelihood that Ray might well balk at involving himself in any legal

proceeding unnecessarily.  Such a reaction is evidenced by Ray's statement during the second

interview with the agents to the effect that he didn't want further contact with the agents or the

defendant's attorney nor any further involvement in the current matter.  Ray, about to be released

from imprisonment, surely did not relish being caught up in a lie - particularly after hearing of

the misrepresentation which helped to produce his recantation of the original affidavit which he

signed.  Without question, Ray was on the cusp of freedom and wanted no interference with

achieving that freedom - whether from the defendant, for whom he was attempting to do a favor,

or from the government agents.

III.    The defendant did not exercise due diligence in attempting to obtain the
        appearance of the potential witness.

As noted in the summary of interactions between the government and Ray, those

interactions began at the instigation of the defendant.  In late January of 2005, the defendant

provided the government with the affidavit signed by Ray and instructed the government that it

had a duty to thoroughly investigate the matter in a search for exculpatory evidence.  In

response, the government notified the defendant that it would be attempting to interview Ray.

No objection  nor request to be present was made.  And prison records indicate that the

defendant (through his counsel) made no contact with Ray for more than four months - until after

the government agents conducted the first interview on June 3, 2005.

The First Circuit, in Hoffman, said that the court should consider the efforts made by a

defendant to actually produce a witness.  The government submits that the defendant has

demonstrated an insufficient degree of effort to produce Ray as its witness, even though that

---

[17]See Attachment 7 (Criminal Record of Eddie Ray, Jr.).

potential witness was confined and, therefore, relatively "available" for development as its witness. In so doing, the defendant displayed a less than serious effort to cultivate Ray as a defense witness.

<u>CONCLUSION</u>

The First Circuit made clear in <u>Byram</u>, as did the Supreme Court in <u>Frazier</u>, that police routinely employ ruses in their dealings with defendants and with potential defense witnesses such as occurred in this case (the misrepresentation to Ray that the defendant had already pled guilty in the current matter) and that such tactics are perfectly permissible. They simply do not constitute impermissible coercion, nor is there evidence that Ray was so coerced. Indeed, his admission in the June 3, 2005, interview with agents that the original affidavit had been false came *prior* to any perjury warning from the agents. It did come subsequent to the misrepresentation, but as the courts have made abundantly clear, that misrepresentation constituted a permissible tactic.

Ray was not even on the investigatory radar screen of the government until the defendant demanded that the government investigate the truth of the assertions contained in the affidavit signed by Ray and provided to the government in January 2005. Ray would, in all likelihood, never have been approached by the government in this matter - but for the insistence of the defendant. The case against Ray is, quite simply, very strong. He made statements to the police, subsequent to his arrest, which clearly demonstrated his knowledge of the contents of the duffel bag - the shotgun. Those statements fatally undermine the defense assertion that the gun was planted. Considering the criminal record of the source of the affidavit (Ray) and the fact that he had recently been housed with the defendant, even without Ray's recantation to the government

agents of the content of his first affidavit, he would have been readily impeachable.

It is true that the government obtained significant additional impeachment material with regard to both Ray and the defendant through the June 3, 2005, interview with Ray. That result, however, was achieved in a permissible manner and as a result of the demands of the defendant that the government investigate matter thoroughly.

Furthermore, this matter has not gone to trial. That occurs on August 15, 2005. Yet, the defendant asks the court to presume that Ray will not appear. The court may well ask what efforts the defendant has made to procure Ray as a witness, other than the solitary interview conducted by counsel in early June 2005. Ray's location was known to the defendant for months - as was the date of trial. A trial subpoena surely could have been served upon him prior to his release. Presumably, the defendant still has the opportunity to locate Ray and compel his appearance - even though he is no longer incarcerated.

The government's effort in its interview with Ray was done, effectively, at the behest of the defendant. It was conducted in an entirely permissible manner. No prosecutorial misconduct occurred. Ray spoke voluntarily and freely and, without threat, acknowledged his role in submission of a falsified statement. Given the facts and circumstances surrounding the affidavit and the government's good faith response to the demands of the defendant, the government

respectfully suggests that the last consideration the court should give to this matter is dismissal, with prejudice.

<div style="margin-left: 45%;">

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:    /s/ Paul R. Moore_____
Paul R. Moore
Assistant U.S. Attorney

</div>

<div style="text-align: center;">

CERTIFICATE OF SERVICE

</div>

     I hereby certify that a true copy of the above document was served upon the attorney for defendant Antonio Nakia Redrick, Melvin Norris, Esq., on August 4, 2005, via overnight mail.

<div style="margin-left: 45%;">

/s/ Paul R. Moore_____
Paul R. Moore
Assistant U.S. Attorney

</div>

August 4, 2005