AFFIDAVIT IN SUPPORT OF GOVERNMENT'S RESPONSE

I, Richard W. Donahue, being duly sworn, do depose and state as follows:

1. I am a Special Agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). I have been a Special Agent with ATF for approximately four and one-half years and during that time I have been involved in numerous investigations of federal firearms laws. I am currently assigned to a group in the Boston Field Division of ATF that, in part, works with the Boston Police Department to uncover violations of laws related to federal firearms, explosives and controlled substance laws in the City of Boston. Based upon my training and experience as an ATF Special Agent, I am familiar with federal firearms laws and have conducted numerous investigations relating to violations of those laws.

2. ATF assigned me the responsibility of investigating the case involving Antonio Nakia Redrick, who was charged by a federal grand jury in Boston on September 29, 2004 in a two-count Indictment. As part of my investigation, I have examined evidence, conducted interviews with witnesses and potential witnesses and have otherwise worked with the Office of the United States Attorney in preparing this matter for trial (which had been scheduled for August 15, 2005).

3. The facts stated herein are based upon my personal involvement in this investigation and my discussions with other law enforcement officers involved with this investigation. In submitting this Affidavit, however, I have not included each and every fact known to me about the investigation, but only those facts that I believe are relevant to the defendant's Motion to Dismiss, filed with this court on July 22, 2005, and to which the government filed its Response on August 4, 2005.

4. On January 21, 2005, Assistant United States Attorney ("AUSA") Paul R. Moore

contacted me to inform me that defense counsel had (that day) provided the government with an affidavit containing a statement from Eddie Ray, Jr. (identified in the government's Response as "Attachment 1"). AUSA Moore verbally summarized the affidavit to me, then provided a copy of it to me. In discussing the affidavit's contents and the implications for the investigation, AUSA Moore indicated that as a matter of both thoroughness and caution the assertions of the affidavit should be investigated and we discussed how that should proceed. AUSA Moore also drew my attention to the portion of the defense counsel's letter (attached to Ray's affidavit) in which he stated that these allegations (Ray's) should be investigated.

5. On January 24, 2005, AUSA Moore and I agreed that the following approach would be followed in an effort to determine the accuracy of Ray's assertions: (a) a review of Eddie Ray, Jr.'s criminal record, to include any indications of periods of incarceration when Ray and defendant Redrick may have been in contact, (b) attempt to interview Ray, (c) attempt to interview Tiffany Richardson (the person whom Ray said in his affidavit had told him that she might plant a gun in Redrick's duffle bag), (d) attempt to obtain police reports reflecting prior interactions between Redrick and Richardson (knowing that Redrick had previously been ordered to stay away from Richardson), and (e) attempt to interview neighbors of Richardson who were familiar with she and Redrick (Richardson's apartment was the location where Redrick was seen with the duffle bag on the day of the offense conduct).

6. AUSA Moore and I agreed that, without question, the purpose of this additional investigatory effort was simply to determine the truth of these assertions, without pre-judging the merits of the assertions. A critical part of my training at ATF included a sworn commitment to follow and develop the facts of a given investigation to where they naturally lead, regardless of

where that path may have initially appeared to lead. In the current matter, I believed that if the evidence ultimately indicated that Richardson had planted a gun in Redrick's duffle bag, that such acts would likely be grounds for criminal prosecution. I was quite prepared to follow the evidence in that direction, should it so lead.

7. Between January 21 and January 24, 2005, I was able to determine from a review of criminal records that Ray and Redrick had been incarcerated during a common period of time at MCI Concord (from 6/8/2004 through 7/2/2004).

8. I also knew from the investigation that Redrick had made statements concerning the duffle bag and its contents *at the time of his arrest* on this matter and that those statements seemed to reveal that he was aware of the firearm in the duffle bag. Based on my experience in comparable investigations, I believed that the knowledge reflected in those statements to be inconsistent with Ray's assertion that Richardson planted the gun. Further, the period during which Ray and Redrick were both incarcerated at MCI Concord seemed to have provided an opportunity to coordinate such a defense strategy.

9. I was further aware from reviewing Redrick's criminal record that he had apparently been engaged in threatening behavior towards Richardson in the past (which included carving images into her apartment door on a recent occasion and other episodes of behavior which led to the order that he stay away from her). In considering those interactions with Redrick, I believed that it was entirely possible that someone in Richardson's position might have motive to see Redrick taken off the streets (given his threatening behavior towards her). That awareness accompanied me throughout the investigation of Ray's assertions.

10. Having determined that Ray was being held in the South Bay Jail, ATF Special

-3-

Agent Phillip Ball and I arrived at the South Bay facility to interview Ray on June 3, 2005. A South Bay correctional officer brought Ray (who was not in handcuffs, leg irons or other form of restraint) to a small conference room where Agent Ball and I were then waiting. Before speaking to us, Ray signed a form (provided by the correctional officer) indicating that he was speaking to us voluntarily and under no compulsion from that facility (referred to as "Attachment 4" in the government's Response). Agent Ball and I identified ourselves as ATF agents to Ray.

11. Ray then sat in a chair on the opposite side of the table in the conference room where Agent Ball and I were also seated. I began the interview by telling Ray that we were there to talk to him about the Antonio Redrick case and asked if he was familiar with it. He replied that he was and nodded his head. I told him that Redrick had pleaded guilty, but that ATF had a concern with the affidavit he had written for Redrick and we wanted to ask him about it. I laid a copy of the affidavit on the table in front of Ray at that time and he looked at it and said that he was familiar with it (referred to as "Attachment 1" in the government's Response). He nodded his head as he examined the affidavit that bore his signature.

12. I then said to Ray: "Look, Eddie. This thing is bullshit. You know it is. This doesn't have to be a big deal. If you were lying about this, I'm not going to make a big deal out of it. You just need to get in front of it right now and tell the truth. If you were lying, then theoretically you broke the law. I'm a gun cop. I don't really care about this kind of thing that much. So let's put this behind you."

13. Ray immediately agreed with my assessment of the affidavit ("Attachment 1") by nodding his head and saying "yeah, yeah, yeah. No problem. I made that up. I was doing a favor for that guy. I felt bad for him and I was mad at the system. And he wrote it and I signed

-4-

it."

14. I then asked Ray how that had happened. He replied by saying that he had "overhead him (Redrick) talking in Concord. I heard him talking about his case and it sounded familiar to me. I had met his girlfriend (Richardson) once. She told me about the case. So, I told him that I remembered hearing about his case. I came up to him, told him that sucks. Redrick asked me to help him out. I told him that I would. So he wrote it. I signed it."

15. I told Ray that if that's what happened, I would need to have him put it in writing. He then elaborated, saying "yeah, man. I knew as soon as I signed it, it was a mistake. I shouldn't have done it." Ray then told me that he couldn't write the new statement and told me that I should do it.

16. I then began to write Ray's new statement by writing a sentence at a time in the way which best reflected what he had told us, then reading it aloud and asking Ray if that was accurate. After he would affirm the accuracy of a sentence, I would proceed to write the next sentence and verify its accuracy in the same way. At the completion of this statement, I told Ray: "Hey, Eddie, if that other one (the first affidavit) was true, that's fine. You have nothing to be worried about." He replied, "no, no, no." I then said, "alright, if this one (the newly-drafted statement) is true, then sign it. Don't sign it if it isn't true." Ray then immediately signed his name to the June 3, 2005, affidavit (referred to as "Attachment 5" in the government's Response).

17. I began to close the interview by saying to Ray, "hopefully, you'll never see me again. I don't think this will be a big deal at all. I appreciate you coming clean. You get out soon, right? What do you have planned?" Ray said that he was getting out soon and told me that

-5-

he was "trying to get these grants from the government for counseling kids before they get in trouble. I want to show them what to do. Teach them right from wrong. I been there." I then joked aloud to Ray, "Eddie, I've seen your record. If the government gives you money, I'm moving to Canada. But good luck to you." Ray laughed, as did I and Agent Ball. We then shook hands with Ray and called the corrections officer to come to the conference room to escort Ray from the conference room.

18. Shortly thereafter, I communicated the results of the interview to AUSA Moore. After that, I provided a copy of the new statement by Ray to AUSA Moore.

19. On June 11, 2005, AUSA Moore informed me that Redrick's counsel was alleging that my investigation (insofar as it involved Ray) had amounted to "prosecutorial misconduct" by the government and that he had filed a Motion to Dismiss. AUSA Moore also told me that Ray had apparently told Redrick's counsel that he had been threatened and tricked into his recantation by me during the June 3, 2005 interview.

20. Shortly thereafter, AUSA Moore asked me to determine from South Bay's records whether there were any visits or phone calls from Redrick's counsel to Ray. I did seek those records and found that defense counsel had met with Ray only once, following my interview with Ray. The records also revealed that Redrick's counsel had not placed any phone calls to Ray (to that point in time).

21. Knowing that Ray was about to be released from South Bay and that there was a sudden serious discrepancy between his statements, I decided to attempt to interview Ray again. On July 7, 2005, Special Agent Mark DeSantis and I returned to South Bay Jail and went through the same procedures prior to the interview (described in paragraphs 10 and 11).

22. I began the interview by saying, "Eddie, remember me? From that Antonio Redrick thing?" Ray replied, tersely, "yeah." I stated that "we have a problem. You signed an affidavit for me last month. And that one said one thing. And now you told Redrick's attorney that you were lying to me."

23. Ray then became visibly angry and began yelling at me, stating "you lied to me. You told me he pled guilty and that was a lie. You fucking lied to me."

24. I responded by saying, "Eddie, it doesn't matter that I lied to you. What matters is did you lie on the affidavit you signed for me? This could be an issue for you. If it turns out you lied to me, you could go to jail for that." Ray responded by becoming even more visibly irritated, saying "you fucking lied to me, you mother fucker! And now I'm supposed to talk to you? And now you're threatening me? Gonna put me in jail?" At this point, Ray was screaming at me and began to stand up.

25. Agent DeSantis then intervened by saying, "Eddie, calm down. He's not threatening you. If you lied on that affidavit, you could be charged with perjury. He's telling you the truth. Let's not make a bigger deal out of this than it has to be. I don't have a problem with you. I don't know much about this. Listen, we're just trying to figure out if you were lying on the first affidavit or lying on the second affidavit. We need to know the truth."

26. Ray replied: "I wasn't lying. I didn't fucking lie." Agent DeSantis then asked him, "which one?" Ray screamed: "I never lied. I didn't lie. Fuck you. They're true. I never told no lie!"

27. I then asked Ray if he told Redrick's counsel that what he had written for me was a lie. He replied: "I didn't tell him shit. I told him that I wanted to talk to my lawyer." Ray then

stood up and began to walk towards the door and shouted "fuck you. Fuck you. I'm leaving."

28. Alarmed at Ray's obvious rage, Agent DeSantis and I stood up and told Ray to calm down. I called the correctional officer for assistance immediately. While waiting for the officer, I told Ray, "Eddie, just listen to me for one more minute. This case is going to be a trial. You would probably get called to testify for Redrick. At that point, you have no choice. You have to tell the truth. If you lie then, you could go to jail." Ray replied: "there ain't no fucking way I'm testifying for anybody. I don't care who the fuck they are," to which I responded by saying "you won't have a choice, Eddie. It's the law. They can make you testify." Ray replied, screaming: "I don't give a fuck about the law. I have no respect for the law. I don't care what they do."

29. I then told Ray that this was "nothing personal" and that "I have no beef for you" and that I'm "doing my job." He said "okay" and we shook hands and he was escorted out of the conference room by the correctional officer.

I hereby certify that the foregoing is true and correct. Executed this 20th day of September, 2005.

_____
Richard W. Donahue, Special Agent
Bureau of Alcohol, Tobacco and Firearms